AO 106 (Rev. 04/10)  Application for a Search Warrant

FILED _____ LODGED
_____ RECEIVED

MAR 11 2020

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Three Apple iPhones, more fully described in Attachment )
A, which are currently in the possession of the Federal )
Bureau of Investigation )

Case No.  MJ20 - 5049

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Three Apple iPhones, more fully described in Attachment A, which are currently in the possession of the Federal Bureau of Investigation at the Olympia, Washington Resident Agency Office

located in the ___ Western ___ District of ___ Washington ___ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1951(a) | Extortion Under Color of Official Right |

The application is based on these facts:

See Affidavit of Special Agent Richard Schroff attached hereto and incorporated herein

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI Special Agent Richard Schroff
*Printed name and title*

Sworn to before me pursuant to CrimRule 4.1.

Date: March 11, 2020

_____
*Judge's signature*

City and state:  Tacoma, Washington

Magistrate Judge Theresa L. Fricke
*Printed name and title*

**AFFIDAVIT**

STATE OF WASHINGTON )
                    )  ss
COUNTY OF PIERCE    )

I, Richard C. Schroff, a Special Agent with the Federal Bureau of Investigation, having been duly sworn, state as follows:

## I.   INTRODUCTION AND PURPOSE OF AFFIDAVIT

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of three electronic devices – three Apple iPhones, more fully described in Attachment A, (collectively, the "Digital Devices) – which are currently in law enforcement possession, and the extraction from these devices the electronically stored information described in Attachment B.

2.      The Federal Bureau of Investigation (FBI) and the Lewis County Joint Narcotics Enforcement Team (JNET) are currently conducting a public corruption investigation involving the introduction of contraband, including illicit drugs, by correctional staff into the Washington State Green Hill School, a medium/maximum security juvenile correctional facility, located in Chehalis, Washington, in exchange for cash payments in violation of Title 18, United States Code, Section 1951(a), Extortion Under Color of Official Right.  Based upon the investigation to date, there is probable cause to believe that the Digital Devices will contain evidence, fruits, and instrumentalities of violations of the 18 U.S.C. § 1951(a).

## II.   AFFIANT BACKGROUND

3.      I am a Special Agent (SA) with the FBI, and have been employed as a criminal investigator with the FBI since July of 2014.  I am a graduate of the FBI Academy in Quantico, Virginia, and have attended various other trainings such as the U.S. Department of Justice, Asset Forfeiture/Money Laundering Section's Basic Financial Investigation Seminar,

AFFIDAVIT OF SA SCHROFF - 1
(2020R00110)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1 │ the FBI's economic crimes conference, and the FBI's public corruption seminar.  The FBI is

2 │ responsible for enforcing federal criminal statutes of the United States. While employed by

3 │ the FBI, I have investigated violent crime, internet child exploitation, violations involving

4 │ controlled substances, public corruption and civil rights violations, and other criminal

5 │ matters which can generally be referred to as white collar crime.  I have gained experience

6 │ through training and everyday work relating to conducting these types of investigations.  I

7 │ have also regularly applied for and been granted search warrants for both physical locations

8 │ and electronic records, searched or had others conduct searches, and used evidence found

9 │ during those search warrants to further my criminal investigations.  As a federal law

10 │ enforcement officer engaged in enforcing the criminal laws of the United States, I am

11 │ authorized by the Attorney General to apply for search warrants.

12 │     4.    The facts set forth in this Affidavit are based on my own personal knowledge,

13 │ knowledge obtained from other individuals during my participation in this investigation,

14 │ including other law enforcement officers, review of documents and records relating to this

15 │ investigation, communications with others who have personal knowledge of the events and

16 │ circumstances described herein, and information gained through my training and experience.

17 │     5.    Because this Affidavit is submitted for the limited purpose of establishing

18 │ probable cause in support of the application for search warrant, it does not set forth each and

19 │ every fact that I or others have learned during the course of this investigation; rather I have

20 │ included only those facts that I believe are necessary to establish probable cause to believe

21 │ that evidence, fruits and instrumentalities, of the above-described violations, as more fully

22 │ described in Attachment B, will be found on the Digital Devices, as described in Attachment

23 │ A.

     **III.    RELEVANT LEGAL PROVISIONS**

24 │     6.    Title 18, United States Code, Section 1951(a), Extortion Under Color of

25 │ Official Right, provides that it is a violation of federal law when a public official obtains

26 │ money that the public official knows the public official is not entitled to receive with the

27 │ knowledge that the money was given in return for taking some official action.  In addition,

28 │

AFFIDAVIT OF SA SCHROFF - 2
(2020R00110)

1  commerce or the movement of an article or commodity in commerce from one state to

2  another was or would have been affected in some way.  As discussed in more detail below,

3  probable cause exists to believe that evidence, fruits and instrumentalities of Title 18, United

4  States Code, Section 1951(a), as more fully described in Attachment B, will be found on the

5  Digital Devices, as described in Attachment A.

6                          **IV.   PROBALE CAUSE**

7  **A.   Green Hill School**

8        7.     Green Hill School (GHS) is a medium/maximum security juvenile

9  rehabilitation facility located in Chehalis, Washington.  The Washington State Department of

10  Children, Youth, & Families – Juvenile Rehabilitation (DCYF) operates GHS.  Pursuant to a

11  Memorandum of Understanding with the Washington State Department of Corrections

12  (DOC), GHS houses individuals in Washington State's Youth Offender Program.  A

13  youthful offender is any person under the age of 18 who is tried, convicted, and sentenced as

14  an adult.  Through the Youth Offender Program, these individuals are housed at a DCYF

15  Juvenile Rehabilitation facility like GHS to ensure their medical, mental health, and

16  developmental needs are addressed.  Since July 2019, youthful offenders can reside at GHS

17  until they reach the age of 25.  At that point, if there is time remaining on their sentence, the

18  individual is transferred to DOC custody.

19  **B.    Information Concerning GHS Staff Involvement in Introducing Contraband**

20        8.     On January 23, 2020, JNET Detectives, GHS Security personnel, the Lewis

21  County Prosecutor, and I met with an individual (Individual #1)[1] who was housed at in the

22  Maple Unit of GHS at the time.  During the interview, Individual #1 stated that it was easy to

23  buy drugs from other GHS residents.  Individual #1 said that residents were often given the

24

25

26  ─────────────────

27  [1] Individual #1 has violent felony convictions for which he is serving his sentence at GHS.  Given the significant risk of retribution to Individual #1 for providing the information discussed herein, I have not provided additional information

28  that others may use to identify him.

AFFIDAVIT OF SA SCHROFF - 3
(2020R00110)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 │ marijuana for free and then later paid for it by having someone on the outside pay for the

2 │ marijuana using the mobile application, Cash App.[2]

3 │    9.    Individual #1 said that a number of the residents at GHS were members of a

4 │ violent street gang. Early in his time at GHS, Individual #1 was frequently involved in

5 │ fights. At some point, a member of the gang approached Individual #1 and told him that he

6 │ could continue to fight every day or Individual #1 could work for the gang by holding onto

7 │ drugs prior to their distribution. Individual #1 agreed to hold onto marijuana for the gang

8 │ member. Individual #1 stated that the held a total of seven packages with the most recent

9 │ time being three days prior to the interview. Individual #1 said he was paid in marijuana for

10 │ holding onto the drugs and was offered the most comfortable level of housing known as

11 │ "Level 4" by the gang member. Individual #1 knew that only GHS staff could award Level

12 │ 4, which I confirmed in later interviews. In spite of that, Individual #1 was given Level 4

13 │ housing shortly after making the agreement with the gang member. Individual #1 said that

14 │ drugs were smuggled into GHS three ways: (1) brought in by corrupted staff members; (2)

15 │ smuggled in during visitation; and (3) brought in by residents transferred from DOC custody.

16 │    10.    Individual #1 also identified three staff members who worked in the Maple

17 │ Unit that he thought were involved in the introduction of contraband into GHS. Individual

18 │ #1 described interactions he had with two of the GHS staff members, Julio Hayes and

19 │                      With respect to Hayes, Individual #1 said that Hayes let Individual #1

20 │ smoke marijuana in the shower, and at a different time, when Individual #1 mentioned

21 │ wishing he had a lighter, Hayes responded, in sum and substance, that "You just have to pay

22 │ for it." According to Individual #1, Hayes charged $26 for a lighter. I interviewed

23 │ Individual #1 a second time several days after to the first interview. In that second interview,

24 │ I asked again about purchasing lighters from Hayes. Individual #1 said Hayes told them to

25 │

26 │ _____

27 │ [2] I know that Cash App is a mobile application that allows users to send money to each other through the app. The user

28 │ can be identified a number of ways, but most frequently they are known by their Cash Tag, e.g. $JohnDoe.

AFFIDAVIT OF SA SCHROFF - 4
(2020R00110)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   just use a battery.  With respect to            , Individual #1 stated that          gave him a

2   screwdriver one time so Individual #1 could hide drugs inside a light.

3       11.    According to Individual #1, at the time of the interview, there were three

4   contraband iPhones in Individual #1's unit at GHS.[3]

5       12.    During the course of my investigation, I learned that on or about January 16,

6   2020, GHS staff found an Apple iPhone in the top of the garbage in the Maple Unit.

7   According to GHS staff, in the evening of January 14, 2020, they became suspicious that a

8   resident in the Maple Unit had a smart phone in his possession after receiving a tip from an

9   individual outside GHS that the resident was making contact with individuals outside GHS

10  through social media.  As a result, GHS staff strip searched the resident and searched his

11  room, but did not find a smart phone.  The next day, January 15, 2020, GHS staff again

12  searched rooms and reported hearing a phone ring, but did not find anything.  On January 16,

13  2020, an Apple iPhone was found in the garbage of the Maple Unit.  GHS staff attempted to

14  charge the phone, but was unsuccessful.  Furthermore, the SIM card was not in the iPhone

15  and the screen appeared to have a fresh crack in it.  Thus, GHS staff assumed the resident

16  smashed the phone on the ground in an attempt to disable it before putting it in the garbage

17  can.  This Apple iPhone Model A1688 with a silver colored back is one of the Digital

18  Devices described on Attachment A.

19      13.    On January 29, 2020, GHS staff informed JNET that GHS staff had obtained

20  and secured possible drug evidence in the facility.  A Chehalis Police Officer responded to

21  GHS and secured the evidence, and a JNET Detective picked up the evidence from the

22  Chehalis Police Department.

23

24

---

[3] Approximately one week after my interviews with Individual #1, I learned information from GHS Security staff that led me to believe that Individual #1 himself was engaged in some nefarious behavior involving the introduction of narcotics into GHS.  Specifically, I learned that a GHS staff member had overheard another resident telling his mother to send a text or money through Cash App to someone who may be Individual #1's wife.  After learning this information, I had no further contact with Individual #1.  Furthermore, during the search of the Maple Unit on February 26, 2020 (discussed below), GHS staff found non-drug contraband, including a picture of what appeared to be a police report, in Individual #1's room.

AFFIDAVIT OF SA SCHROFF - 5
(2020R00110)

14.     This evidence was a blue colored nitrile type glove containing a white granule type substance.  The substance was field tested for cocaine, amphetamine, and fentanyl, but the results came back negative, though the testing detective told me there was some form of reaction between the substance and the test kit.  The evidence (glove and substance) was put into an evidence bag and weighed with a total weight of 70.2 grams.  The unknown substance is pending further testing at the Washington State Crime Lab.

**C.     Julio Hayes**

15.     On February 25, 2020, I oversaw an operation conducted by the FBI and JNET involving Julio Hayes or                    two of the possibly corrupt GHS staff members Individual #1 identified in his interview.  As part of the operation, we decided to perform surveillance in an area of Chehalis leading to the entrance of GHS to attempt to contact one or both of the two on their way to work at GHS to see if they were in possession of contraband.  That afternoon, members of an FBI surveillance team observed Hayes driving his vehicle, a white Subaru Impreza with Washington license plate BMZ6395, driving toward Chehalis.  I informed other law enforcement officers to conduct a traffic stop on Hayes if he was observed violating any traffic laws.  A JNET Detective observed Hayes driving 35 MPH in a 25 MPH zone.  At that point, the JNET Detective directed a Chehalis Police K9 Officer to perform a traffic stop on Hayes' Impreza.

16.     The K9 Officer pulled Hayes over and a JNET Detective parked his unmarked police vehicle behind the K9 Officer's marked patrol vehicle.  The K9 Officer approached Hayes' Impreza, and Hayes provided the K9 Officer with Hayes' license, registration and insurance.  The insurance cards were expired.  At that point, the JNET Detective approached, identified himself to Hayes, and asked if Hayes had any drugs or weapons in the vehicle. Hayes replied that he did not.  The JNET Detective asked Hayes to exit the Impreza so that the K9 Officer and his K9 partner, Tiesto,[4] could conduct an outer sniff of the Impreza. Hayes said yes, exited the Impreza and walked to the sidewalk while the JNET Detective

---

[4] Tiesto is trained and certified to detect the odors of methamphetamine, heroin, and cocaine.

AFFIDAVIT OF SA SCHROFF - 6
(2020R00110)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1    began writing a traffic citation.  The K9 Officer deployed Tiesto on a narcotics sniff of the

2    exterior of the Impreza, and Tiesto alerted to the right rear passenger side door handle, front

3    door passenger door handle, and the driver side door handle.  Around this time, Hayes

4    informed the JNET Detective that he did in fact have a small amount of marijuana inside his

5    backpack and explained that the marijuana was wrapped inside rubber gloves to keep the

6    smell down.

7        17.    At that point, the JNET Detective read Hayes his Miranda rights.  Hayes

8    acknowledged that he understood his rights and agreed to talk further.  Hayes gave verbal

9    consent for law enforcement to search his backpack and vehicle, and he explained there was

10   only 3.5 grams of marijuana in his backpack.  The JNET Detective asked Hayes where he

11   worked, and Hayes said he worked at Green Hill, and that he starts at 3:00 p.m.

12       18.    Another JNET Detective retrieved and searched Hayes' backpack.  Inside the

13   backpack, he found several blue rubber gloves (or the fingers of the gloves) with marijuana

14   in them.  Based upon what appeared to be a significant amount of marijuana which appeared

15   to be packaged for distribution, Hayes was placed under arrest and transported to the

16   Chehalis Police Department.  Hayes' Impreza was secured at the scene and then transported

17   to the Centralia evidence storage.  A JNET Detective applied for and obtained a state

18   telephonic search warrant by the Honorable James Buzzard.  Hayes had provided his consent

19   to search the vehicle, both verbally and by signing an FBI FD-26, consent to search, form.

20   The investigative team decided to pursue a search warrant out of an abundance of caution.

21       19.    Upon searching the Impreza, law enforcement officers found a trench type coat

22   in the backseat.  Inside the coat, the officers found three vape pen type cartridges wrapped

23   inside the fingers of a blue rubber glove which Hayes later confirmed to be "dabs" [5] of liquid

24   marijuana.  They also found a pill bottle in Hayes' name for Hydrocodone-Acetaminophen.

25   The JNET Detective found 12 pills inside the bottle marked with "SG 181."  The Detective

26   _____

27   [5] In my training and experience I know Dabs to be a derivative form of marijuana which can be smoked.  In his interview
     (see below), Hayes confirmed that he understood dabs to be a marijuana product.

28

AFFIDAVIT OF SA SCHROFF - 7
(2020R00110)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  searched for that code on the website drugs.com and learned it was assigned to the scheduled
2  prescription drug Gabapentin.
3         20.    At the Chehalis Police Department, a JNET Detective and I interviewed Hayes.
4  Hayes was again provided with an advisement of his Miranda rights and signed a form
5  indicating he understood his rights and wished to speak without an attorney present. During
6  the interview, Hayes admitted to introducing contraband for several residents incarcerated in
7  GHS. Hayes admitted that he started doing so approximately six months ago when Resident
8  1[6] asked Hayes to bring him chewing tobacco and Hayes agreed. Hayes also admitted
9  smuggling marijuana into GHS for Resident 1. In addition, Hayes stated that he smuggled
10 contraband into GHS for Resident 2 and Resident 3, including marijuana, vape pens, "dabs,"
11 and lighters. With respect to Resident 2, Hayes admitted to meeting with one of Resident 2's
12 family members outside of GHS on approximately three occasions where he received drugs
13 from them to later introduce into GHS for Resident 2. The drugs included one that was a
14 white powder and another that was a brown powder, though Hayes claimed to not know
15 exactly what they were. Hayes stated that he smuggled in mobile phones for all three
16 recipients. He received the mobile phones from the residents' family members (either
17 directly or through the mail), and subsequently smuggled them into GHS for the residents.
18 Based upon my review of Hayes' phone discussed in detail below, the residents used the
19 mobile phones to communicate with Hayes about the introduction of contraband and the
20 illicit payments to Hayes in exchange for these acts. They also used mobile apps, such as
21 Cash App, to pay bribes to Hayes in return for his smuggling of contraband. The also told
22 Hayes they had coordinated with other people outside of GHS to have them pay bribes to
23 Hayes in exchange for the contraband introduction.
24
25
_____
26 [6] I refer to those currently in custody as residents of GHS by a number instead of their name (e.g., Resident 1). I do so for
   their own safety. While they appear to be co-conspirators in my investigation, they are in a custodial environment and
27 are either members of or are exposed to violent gangs. Out of concern for their safety, their names are omitted in this
   Affidavit.
28

AFFIDAVIT OF SA SCHROFF - 8
(2020R00110)

1    21.    Hayes admitted that the residents and/or their family members paid money to

2 Hayes for introducing the contraband. He stated that he charged them between $100 and

3 $200 per mobile phone. For marijuana, he claimed he charged the recipients twice what he

4 paid for it in a Washington State licensed marijuana retailer. For example, when Hayes

5 bought $20 worth of marijuana outside GHS, he charged inmates $40 - $20 for the cost of

6 the marijuana and $20 as payment to Hayes. Hayes said he received half of his payment in

7 cash from the residents and half on Cash App from either residents or family members

8 outside GHS.

9    22.    During the interview, Hayes repeatedly tried to minimize his conduct or

10 mislead investigators. For example, he initially said that he had only brought in marijuana

11 for the residents but later, during different portions of the interview, admitted to introduction

12 of the phones, vape pens, dabs, and other drugs. Further, he initially told us that he only

13 purchased marijuana for introduction himself, though later he then admitted to meeting with

14 Resident 2's family and receiving phones for introduction from Resident 2 and 3's families.

15 He also initially said he only met with Resident 2's family once, but later admitted he met

16 with them on several occasions. I repeatedly confronted Hayes about his minimizations and

17 omissions and told him that false statements could be a Federal crime. After being

18 confronted, Hayes repeatedly apologized and said that he would stop omitting information or

19 minimizing.

20    23.    Hayes gave me permission to search his mobile phone and signed a consent to

21 search form to document his consent. I searched the phone in Hayes' presence. I found text

22 messages that Hayes told me were communications between him and a family member of

23 Resident 2 and communications with Resident 2's girlfriend. These messages discussed

24 which contraband Hayes would smuggle to Resident 2, the method and amount of payment,

25 and meeting in person to provide Hayes the contraband. There were also text messages

26 between two contacts that were saved in Hayes' contacts as a single letter (as opposed to a

27 first and last name). Hayes said that one was for Resident 2 and the other for Resident 3,

28 who were both incarcerated inside GHS at the time of the communications. I reviewed the

1   messages and the following are examples of what was written between Hayes (H) and
2   Resident 2 (R2) on January 5, 2020:

3       a.   R2: "Hell yeah aye so what's going on are you under investigation or
4            what's going on?"[7]

5       b.   H: "No it's being dropped"

6       c.   R2: "Okay koo so your still good to bring shit?"

7       d.   H: "yeah"

8       e.   R2: "Wussup can you bring me a cartridge N Kush when you come in?"

9       f.   H: "Small amounts yes"

10  The following are examples of what was written between Hayes (H) and Resident 3 (R3) on
11  January 22, 2020:

12      a.   R3: "She sent the shut fir the ounce and cartridge"

13      b.   H: "Yes just got it"

14      c.   R3: "Don't forget a lighter bro"

15      d.   H: "Yeah"

16      e.   R3: "Aye give it to me before movement"

17      f.   H: "Ok"

18      24.   At the end of his interview, Hayes was released from custody.  I have been
19  informed that GHS has terminated Hayes' employment with DCYF.

20  **D.   GHS's Unit Search**

21      25.   The day after Hayes' interview, February 26, 2020, in response to Hayes'
22  statements concerning his introduction of contraband into the facility, the GHS Facility
23  Manager, using staff from a different living unit, conducted a unit search in the unit Hayes
24  (and the other two alleged corrupt staff) worked.  The GHS Facility Manager used other staff
25  in order to ensure that any staff in the unit who had introduced contraband into the unit could
26  not tell residents to hide or destroy any contraband.

27  _____

28  [7] GHS staff has not informed me of any previous misconduct investigations related to Hayes.

AFFIDAVIT OF SA SCHROFF - 10
(2020R00110)

1      26.    The GHS Facility Manager directed the staff conducting the search to search

2  the entire unit building and have all residents complete a strip search before returning to their

3  assigned rooms.  During the search, the staff found numerous items of contraband in

4  approximately 19 different residents' rooms[8] and a common area, including, among other

5  things, two of the Digital Devices:[9]

6          a.    an iPhone Model A1660 with a gold colored back found inside the

7  intercom a resident's room;[10] and

8          b.    an iPhone Model A1660 with a silver colored back found behind the

9  intercom system inside Resident 3's room.

10      27.    GHS staff also found numerous items indicative of drug distribution and use,

11  including, among other things:  marijuana (including some found inside a glove), empty

12  gloves (including one box of gloves), four empty finger tips from a glove, nine empty small

13  zip lock plastic bags (consistent with drug bags), a vape pen, an e-cigarette adapter, and a

14  lighter.

15  **E.**    **The Digital Devices**

16      28.    On January 30, 2020, GHS staff turned over the mobile phone found in the

17  garbage can on January 16, 2020, to me.  On February 27, 2020, GHS staff turned over the

18  two mobile phones GHS staff found during the February 26, 2020, search to me.   Based

19  upon the evidence found on Hayes' mobile phone, I believe that evidence of the bribery

20  scheme to introduce illicit contraband will be found on the Digital Devices, including

21  messages between residents and Hayes, messages between residents and other corrupt staff,

22

23

---

24  [8] Some of the items were hidden in the speaker boxes in the rooms.

25  [9] The third Digital Device was located in the garbage can in January 2020 as discussed above.

    [10] This resident was not Resident 1, 2, or 3 nor was it a resident discussed during interview with Hayes. I know from

26  training and experience that cell phones inside custodial environments are often shared among different inmates.

    Sometimes the inmates will change sim cards in the phones. A sim card allows a phone to communicate with a cellular

27  network but does not store data related to the use of the phone, such as text messages. That data will remain on the phone

    unless a user takes specific actions to delete it. Even then, using certain forensic tools, that data may be recoverable by

28  investigators.

AFFIDAVIT OF SA SCHROFF - 11
(2020R00110)

1   and messages between residents and individuals outside GHS who help facilitate the bribery

2   scheme.

3       29.     While DCYF and the FBI might already have all necessary authority to search

4   these Digital Devices, I seek this search warrant out of an abundance of caution that an

5   examination of the Digital Devices will comply with the Fourth Amendment and other

6   applicable laws.

7       30.     The Digital Devices are currently in storage at the Olympia Resident Agency

8   of the FBI's Seattle Division.  In my training and experience, I know that the Digital Devices

9   have been stored in a manner in which its contents are, to the extent material to this

10  investigation, in substantially the same state as they were when the Digital Devices first

11  came into the possession of GHS staff.

12      31.     I know from my training and experience that the presence of electronic

13  devices, specifically mobile phones, presents a significant risk to the safety and security of

14  custodial facilities like GHS.  First, the use of mobile phones may allow residents to

15  communicate with individuals outside the facility to orchestrate and facilitate the

16  introduction of contraband into the facility through, among other things, placing and

17  receiving calls, text messaging, using other messaging apps, and using payment apps, like

18  Cash App, to exchange money.  Second, the use of mobile devices inside a custodial facility

19  to coordinate the smuggling of contraband, such as illicit substances, also creates a threat to

20  staff, inmates, and communities.  The presence of illicit mobile phones and the contraband

21  they facilitate the introduction of may: (1) lead to residents assaulting staff or other inmates

22  while in an altered state of mind from drug use; (2) lead to violence or be used themselves to

23  protect lines of supply and distribution networks; and (3) be used to retaliate against staff

24  who are not compromised and seek to enforce the rules.  In a notable example, a supervisory

25  corrections officer in a corrections department located in the U.S. Southeast was brutally

26  assaulted in an attempted murder in his home in an attack coordinated from inside a

27  correctional facility using a contraband cell phone.  Further, the presence of contraband

28  phones allows inmates to conduct covert communications outside of correctional facilities'

AFFIDAVIT OF SA SCHROFF - 12
(2020R00110)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  monitored lines with other members of violent street gangs or other criminals and to

2  participate in other criminal activity committed from inside custodial facilities against

3  members of the community.

4                      **V.  TECHNICAL TERMS**

5         32.  Based on my training and experience, I use the following technical terms to

6  convey the following meanings:

7                 a.  Wireless telephone:  A wireless telephone (or mobile telephone,

8  or cellular telephone) is a handheld wireless device used for voice and data communication

9  through radio signals.  These telephones send signals through networks of

transmitter/receivers, enabling communication with other wireless telephones or traditional

10  "land line" telephones.  A wireless telephone usually contains a "call log," which records the

11  telephone number, date, and time of calls made to and from the phone.  In addition to

enabling voice communications, wireless telephones offer a broad range of capabilities.

12  These capabilities include: storing names and phone numbers in electronic "address books;"

sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and

13  storing still photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing and

14  downloading information from the Internet.  Wireless telephones may also include global

15  positioning system ("GPS") technology for determining the location of the device.

16                 b.  Digital camera:  A digital camera is a camera that records

17  pictures as digital picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images.  Images can

18  usually be retrieved by connecting the camera to a computer or by connecting the removable

19  storage medium to a separate reader.  Removable storage media include various types of

flash memory cards or miniature hard drives.  Most digital cameras also include a screen for

20  viewing the stored images.  This storage media can contain any digital data, including data

21  unrelated to photographs or videos.

22                 c.  Portable media player:  A portable media player is a handheld

23  digital storage device designed primarily to store and play audio, video, or photographic

files.  However, a portable media player can also store other digital data.  Some portable

24  media players can use removable storage media.  Removable storage media include various

types of flash memory cards or miniature hard drives.  This removable storage media can

25  also store any digital data.  Depending on the model, a portable media player may have the

26  ability to store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1          d.     GPS: A GPS navigation device uses the Global Positioning
2 System to display its current location. It often contains records the locations where it has
3 been. Some GPS navigation devices can give a user driving or walking directions to another
location. These devices can contain records of the addresses or locations involved in such
4 navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24
5 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.
Each satellite repeatedly transmits by radio a mathematical representation of the current
6 time, combined with a special sequence of numbers. These signals are sent by radio, using
specifications that are publicly available. A GPS antenna on Earth can receive those signals.
7 When a GPS antenna receives signals from at least four satellites, a computer connected to
8 that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes
altitude with a high level of precision.

9

10          e.     PDA: A personal digital assistant, or PDA, is a handheld
electronic device used for storing data (such as names, addresses, appointments or notes) and
11 utilizing computer programs. Some PDAs also function as wireless communication devices
12 and are used to access the Internet and send and receive e-mail. PDAs usually include a
memory card or other removable storage media for storing data and a keyboard and/or touch
13 screen for entering data. Removable storage media include various types of flash memory
14 cards or miniature hard drives. This removable storage media can store any digital data.
Most PDAs run computer software, giving them many of the same capabilities as personal
15 computers. For example, PDA users can work with word-processing documents,
16 spreadsheets, and presentations. PDAs may also include global positioning system ("GPS")
technology for determining the location of the device.

17

18          f.     IP Address: An Internet Protocol address (or simply "IP
19 address") is a unique numeric address used by computers on the Internet. An IP address is a
series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).
20 Every computer attached to the Internet computer must be assigned an IP address so that
21 Internet traffic sent from and directed to that computer may be directed properly from its
source to its destination. Most Internet service providers control a range of IP addresses.
22 Some computers have static—that is, long-term—IP addresses, while other computers have
23 dynamic—that is, frequently changed—IP addresses.

24

25          g.     Internet: The Internet is a global network of computers and other
electronic devices that communicate with each other. Due to the structure of the Internet,
26 connections between devices on the Internet often cross state and international borders, even
when the devices communicating with each other are in the same state.

27

28

AFFIDAVIT OF SA SCHROFF - 14
(2020R00110)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

33.     Based on my training, experience, and research, I know that an Apple iPhone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and a PDA.  I also know that an Apple iPhone can be used to access the Internet to, among other things, search the world wide web, transmit messages through the iPhone's iMessaging app, through text messages, and through other apps, such as Facebook, WhatsApp, Twitter, Snapchat, and Instagram.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## VI.     ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

35.     There is probable cause to believe that things that were once stored on the Digital Devices may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from

1  operating system or application operation, file system data structures, and virtual memory
2  "swap" or paging files. Computer users typically do not erase or delete this evidence,
   because special software is typically required for that task. However, it is technically
3  possible to delete this information.

4         d.      Similarly, files that have been viewed via the Internet are sometimes
5  automatically downloaded into a temporary Internet directory or "cache."

6      36.    There is probable cause to believe that the Digital Devices are permeated with
7  evidence of the bribery scheme. As noted above, my review of Hayes' phone revealed that
8  he was communicating directly with residents concerning the introduction of contraband into
9  GHS and the illicit payments the residents made to him in return. Some of those illicit
10 payments may have been made through mobile apps, like Cash App, on the Digital Devices.
11 Furthermore, since, on at least a few occasions, Hayes was meeting up with residents'
12 relatives to obtain the contraband to smuggle into GHS, it is likely there are communications
13 between the residents and their friends and family concerning the bribery scheme.

14     37.    *Forensic evidence.* As further described in Attachment B, this application
15 seeks permission to locate not only electronically stored information that might serve as
16 direct evidence of the crime described on the warrant, but also forensic evidence that
17 establishes how the Digital Devices were used, the purpose of their use, who used them, and
18 when. There is probable cause to believe that this forensic electronic evidence might be on
19 the Digital Devices because data on the storage medium can provide evidence of a file that
20 was once on the storage medium but has since been deleted or edited, or of a deleted portion
21 of a file (such as a paragraph that has been deleted from a word processing file).

22     38.    *Manner of execution.* Because this warrant seeks only permission to examine a
23 device already in law enforcement's possession, the execution of this warrant does not
24 involve the physical intrusion onto a premises. Consequently, I submit there is reasonable
25 cause for the Court to authorize execution of the warrant at any time in the day or night.

26
27
28

AFFIDAVIT OF SA SCHROFF - 16
(2020R00110)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

**VII.   DIGITAL DEVICES AS INSTRUMENTALITIES OF THE CRIMES**

39.     As noted above, the Digital Devices were critical instrumentalities of the bribery scheme.  First, the Digital Devices were likely[11] contraband that Hayes admitted to smuggling into GHS in return for illicit payment.  Furthermore, the Digital Devices allowed the inmates to communicate directly with Hayes, and possibly other corrupt staff, in order to set up the scheme, including ordering specific contraband, such as marijuana, and negotiating and executing payment.

**VIII.   PAST EFFORTS TO OBTAIN ELECTRONICALLY STORED INFORMATION**

40.     There have been no past efforts to obtain electronically stored content of the sort that is presumably located on the Digital Devices.

**IX.   SEARCH TECHNIQUES**

41.     Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for will permit imaging or otherwise copying all data contained on the Digital Devices, and will specifically authorize a review of the media or information consistent with the warrant.

//

//

---

[11] Hayes admitted to introducing two Apple iPhones and a "Droid", which I understood to not be an Apple device. The three devices we are applying to search are Apple iPhones.

AFFIDAVIT OF SA SCHROFF - 17
(2020R00110)

42.   In accordance with the information in this affidavit, law enforcement personnel will execute the search of the Digital Devices pursuant to this warrant as follows:

a.   Securing the Data

i.   In order to examine the ESI in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to produce a complete forensic image, if possible and appropriate, of the Digital Devices.[12]

ii.   Law enforcement will only create an image of data physically present on or within the Digital Devices.  Creating an image of the Digital Devices will not result in access to any data physically located elsewhere.  However, Digital Devices that have previously connected to devices at other locations may contain data from those other locations.

b.   Searching the Forensic Images

Searching the forensic images for the items described in Attachment B may require a range of data analysis techniques.  In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant.  The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this affidavit.

## X.   REQUEST FOR SEALING

43.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the

---

[12] The purpose of using specially trained computer forensic examiners to conduct the imaging of digital devices or other electronic storage media is to ensure the integrity of the evidence and to follow proper, forensically sound, scientific procedures.  When the investigative agent is a trained computer forensic examiner, it is not always necessary to separate these duties.  Computer forensic examiners often work closely with investigative personnel to assist investigators in their search for digital evidence.  Computer forensic examiners are needed because they generally have technological expertise that investigative agents do not possess.  Computer forensic examiners, however, often lack the factual and investigative expertise that an investigative agent may possess on any given case.  Therefore, it is often important that computer forensic examiners and investigative personnel work closely together.

AFFIDAVIT OF SA SCHROFF - 18
(2020R00110)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

application and search warrant.  I believe that sealing these documents is necessary because
the investigation is ongoing.  Specifically, I am still investigating whether additional GHS
staff were corrupted into smuggling contraband into GHS.  I am also continuing to
investigate the full scope of involvement by other residents and individuals on the outside
who helped facilitate the bribery scheme.  If these warrant materials were left unsealed, other
subjects of the investigation could tamper with witnesses or alter or destroy evidence,
including digital evidence on the other subjects' mobile phones.  Thus, premature disclosure
of the contents of this affidavit and related documents may have a significant and negative
impact on the continuing investigation and may severely jeopardize its effectiveness.

## VI.   CONCLUSION

44.     Based on the above, there is probable cause to believe that the crime of
Extortion Under Color of Official Right, in violation of 18 U.S.C. § 1951(a) has been
committed and that evidence, as more fully described in Attachment B, will be present on the
Digital Devices.  Therefore there is probable cause for a search warrant authorizing the
examination of the Digital Devices described in Attachment A to seek the items described in
Attachment B.

RICHARD C. SCHROFF
Special Agent
Federal Bureau of Investigation


The above-named agent provided a sworn statement attesting to the truth of the
foregoing affidavit on the 11th of March, 2020.


THERESA L. FRICKE
United States Magistrate Judge

AFFIDAVIT OF SA SCHROFF - 19
(2020R00110)

1
2

**ATTACHMENT A**
**Items to be Searched**

3       The items to be searched are the Digital Devices, currently in in storage at the

4   Olympia, Washington Resident Agency of the FBI's Seattle Division:

5              a.      an iPhone Model A1660 with a gold colored back found inside the

6   intercom a resident's room;

7              b.      an iPhone Model A1660 with a silver colored back found behind the

8   intercom system inside Resident 3's room;

9              c.      An iPhone Model A1688 with a silver colored back found in the

10  garbage of the wing where Hayes was assigned to work.

11      This warrant authorizes the forensic examination of the Digital Devices for the

12  purpose of identifying the electronically stored information described in Attachment B.

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AFFIDAVIT OF SA SCHROFF - 20
(2020R00110)

## ATTACHMENT B
### Items to be Searched for and Seized

The items to be seized are the following records on the Digital Devices described in Attachment A that are evidence of violations of Extortion Under Color of Official Right, Title 18, United States Code, Section 1951(a):

1. Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

2. Stored list of recent received, sent, or missed calls;

3. Stored contact information;

4. Stored communications, including email,[13] text messages (including short message service (SMS) and multimedia messaging service (MMS)), iMessages, and text messages or other communications on social media platforms such as Facebook Messenger, WhatsApp, Snapchat, Instagram, TikTok, Kik, Cash App, or any other communication service capable of sending and receiving written or visual communications.

5. Any notes, journals, logs, ledgers, or other lists which may account for the purchase and sale of contraband;

6. All communications logs indicating other devices and communications devices the subject devices may have communicated with along with the corresponding date and time.

7. All payments through mobile payment accounts, such as Cash App or Apple Cash, which would allow a user to send or receive currency or any other instrument with value such as digital currency, such as Bitcoin, stocks, bonds, precious metals, or any other valuable item that can be exchanged as a form of payment.

8. Videos or photographs related to Extortion Under Color of Official Right, Title 18, United States Code, Section 1951(a), or videos or photographs that may show the user of

---

[13] This warrant only authorizes seizure of emails stored on the Digital Devices, and does not permit seizure of emails stored on servers, the cloud, or other locations.

AFFIDAVIT OF SA SCHROFF - 21
(2020R00110)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   the phone and/or co-conspirators, including any embedded GPS data associated with these

2   photographs;

3        9.     Records of Internet or browsing activity related to Extortion Under Color of

4   Official Right, Title 18, United States Code, Section 1951(a); and

5       10.    User, subscriber, or log information which may indicate which accounts may

6   have been used on the devices and by which user.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SA SCHROFF - 22
(2020R00110)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970